Carol Patricia HODSON, et
al., Plaintiffs,

v.

A. H. ROBINS COMPANY, INC., et
al., Defendants.

Civ. A. Nos. 80–0979–R, 81–0011–R, 81–0023–R, 81–0025–R, 81–0028–R, 81–0032–R, 81–0035–R, 81–0084–R, 81–0085–R, 81–0087–R, 81–0098–R to 81–0108–R, 81–0286–R, 81–0287–R, 81–0419–R, 81–0711–R and 81–0922–R.

United States District Court,
E. D. Virginia,
Richmond Division.

Nov. 24, 1981.

J. Michael Sconyers, Speiser, Krause & Madole, Falls Church, Va., Philip Silverman, Annandale, Va., Conklin, Davids & Friedman, Michael Friedman, San Francisco, Cal., Clifford J. Shoemaker, Washington, D. C., for plaintiffs.

Kevin J. Dunne, Sedwick, Detert, Moran & Arnold, San Francisco, Cal., for Davis and Lerner.

Barbara L. Gately, Washburn, Kemp & Wagenseil, San Francisco, Cal., for Pee Wee Molding Corp.

J. Jay Corson, IV, Boothe, Prichard & Dudley, Stephen W. Robinson, Fairfax, Va., H. H. McVey, III, McGuire, Woods & Battle, Richmond, Va., for defendants.

G. Kenneth Miller, May, Miller & Parsons, Richmond, Va., for Davis, Lerner and Pee Wee Molding Corp.

## MEMORANDUM

MERHIGE, District Judge.

## I. FACTS

The plaintiffs in these cases are English citizens who were prescribed and used the Dalkon Shield ("Shield"), an intrauterine contraceptive device manufactured by defendant A. H. Robins Company, Inc. ("Robins"). For the most part, the Shields were allegedly inserted and removed by British physicians in the United Kingdom. Plaintiffs seek recovery, for injuries[1] allegedly caused by the device, from Robins, a Virginia corporation with its principal place of business in Richmond, Virginia, Pee Wee Molding Corp. ("Pee Wee"), incorporated under the laws of New York with its sole office in Brooklyn, New York, Irwin S. Lerner ("Lerner"), a resident of Connecticut, and Hugh J. Davis, a Maryland resident. They bring claims of negligence in the design, manufacture, distribution and testing of the Shield, strict liability, breach of express warranty, fraudulent advertising and promotion of the device, willful failure to disclose known defects in the product and civil conspiracy among the defendants to suppress such information. A number of these actions were originally filed in the United States District Court for the Northern District of California and were transferred to this Court pursuant to 28 U.S.C. § 1406(a).

All defendants have moved to dismiss these cases on grounds of improper venue under the general venue statute, 28 U.S.C. § 1391. Robins, Lerner and Davis also urge dismissal under the doctrine of *forum non conveniens.* Robins further asserts that dismissal is warranted under F.R.Civ.P. Rule 44.1.

This Court's jurisdiction over the subject matter of these cases rests on 28 U.S.C. § 1332(a)(1), diversity of citizenship. For the purpose of these motions, the Court assumes that it has jurisdiction over all the defendants under Va.Code § 8.01–328.1 (1977 repl. vol.).

## II. VENUE

Under 28 U.S.C. § 1391(a), a civil action in which jurisdiction is founded solely on diversity of citizenship may be brought only in the district where all the plaintiffs reside, all the defendants reside, or "in which the claim arose." Alien citizens have no residence in any district for purposes of venue. *Galveston, Harrisburg and San Antonio Railway Co. v. Gonzales,* 151 U.S. 496, 14 S.Ct. 401, 38 L.Ed. 248 (1894); *Acosta v. Grammer,* 402 F.Supp. 736 (E.D.Mo.1975); *Prudencio v. Hanselmann,* 178 F.Supp. 887 (D.Minn.1959). Venue clearly is proper in this district with respect to Robins, since a corporation may be sued in any judicial district in which it is incorporated or licensed to do business or is doing business, and that district is seen as the corporation's residence for venue purposes. 28 U.S.C. § 1391(c). Pee Wee, however, is a New York corporation and is not authorized to do business in Virginia. It has no representatives, employees or property here and has not engaged in any business transactions in Virginia other than the shipment to Richmond and Lynchburg, Virginia of plastic parts it molded for the Shield from 1971 to 1974.[2] Even assuming that Pee Wee's activities constituted "doing business" in this district during that period, it does not appear that Pee Wee was transacting business here at the time relevant for determin-

---

1. Plaintiffs' claimed injuries include pelvic inflammatory disease, peritonitis, and severe shock to nerves and nervous system.

2. Affidavit of William P. Plisco, president and sole shareholder of Pee Wee Molding Corp., paragraphs 9–13.

ing whether venue is proper, *i.e.*, the point when the plaintiffs' causes of action arose. *Snyder v. Eastern Auto Distributors, Inc.*, 357 F.2d 552 (4th Cir. 1966), *cert. denied*, 384 U.S. 987, 86 S.Ct. 1889, 16 L.Ed.2d 1004 (1966). Nor are Lerner and Davis residents of this district. Venue is proper in this court, then, against all these defendants only if it can be said that the plaintiffs' claims against them "arose" here within the meaning of § 1391(a). The burden is on the plaintiffs to establish that venue is appropriate in this district. *See Bartholomew v. Virginia Chiropractors Association, Inc.*, 612 F.2d 812 (4th Cir. 1979) *cert. denied*, 446 U.S. 938, 100 S.Ct. 2158, 64 L.Ed.2d 791 (1980); 15 Wright, Miller and Cooper, *Federal Practice and Procedure*, § 3826 (1976 and 1978 Supp.).

The term "claim" in § 1391(a) refers to the "aggregate of operative facts giving rise to rights enforceable in the courts." *United States Fidelity & Guaranty Co. v. Alexander*, 463 F.Supp. 687, 691 (S.D.Ga. 1979); *Maney v. Ratcliff*, 399 F.Supp. 760, 766 (E.D.Wis.1975).[3] Plaintiffs' claims include, as the Court has noted, alleged defects in the Shield and resultant liability on grounds of negligence, strict liability and breach of warranty, fraudulent advertising of the device, willful failure to disclose known risks caused by use of the Shield, and civil conspiracy to misrepresent its safety and conceal its problems.

The search for the genesis of plaintiffs' claims requires some discussion of the history of the Dalkon Shield. The record reflects that it was co-invented and designed in 1968 by Lerner in Connecticut and Davis, a medical doctor and associate professor at Johns Hopkins University in Maryland. In 1969, the two formed the Dalkon Corporation in Connecticut to manufacture and distribute the device. That company assigned all of its rights and interests in the Shield to Robins in June, 1970. From 1971 to 1974, Robins manufactured the devices in Rich-

mond and at the location of a wholly owned subsidiary, the Chap Stick Company, in Lynchburg, Virginia. Both Lerner and Davis remained consultants to Robins after the 1970 transfer and received a royalty based on the gross sales price of all Shields sold thereafter. Robins distributed the product nationally and, through a wholly-owned subsidiary, A. H. Robins Co., Ltd., in England from 1971 until it was removed from the market in 1974. From 1968 to 1970, Pee Wee molded the plastic portion of the Shield in New York and shipped them to Lerner in Connecticut. From 1971 to 1974, it molded both this plastic part and the inserter stick and shipped them to Robins in Richmond and Lynchburg.[4]

Congress added the "claim arose" language to § 1391(a) and (b) in 1966. The amendment was "designed to close the 'venue gaps' that existed under earlier versions of the statute in situations in which joint tortfeasors, or other multiple defendants who contributed to a single injurious act, could not be sued jointly because they resided in different districts." *Leroy v. Great Western United Corp.*, 443 U.S. 173, 184 n.17, 99 S.Ct. 2710, 2717 n.17, 61 L.Ed.2d 464 (1979). *See also Brunette Machine Works, Ltd. v. Kockum Industries, Inc.*, 406 U.S. 706, 710 n.8, 92 S.Ct. 1936, 1939 n.8, 32 L.Ed.2d 428 (1972). The Court in *Leroy* viewed a Texas corporation's challenge to the takeover statutes of three states as separate claims against the individual officials of each state which could not be joined in one action. The instant plaintiffs, on the other hand, allege that wrongful conduct by each defendant contributed to the injuries received from their use of the Dalkon Shield. These cases present just the sort of "venue gap" at which the amendment to § 1391(a) and (b) was directed: allegedly wrongful conduct by multiple defendants residing in different districts which caused injury to the plaintiffs. If the plaintiffs' claims did arise in this district, venue is proper in this court as to all the defendants.

---

**3.** The determination of where a claim arose for purposes of federal venue under § 1391 is a federal question the resolution of which depends on federal law. *Leroy v. Great Western*

*United Corp.*, 443 U.S. 173, 183 n.15, 99 S.Ct. 2710, 2717 n.15, 61 L.Ed.2d 464 (1979).

**4.** Plisco affidavit, paragraphs 2–4.

The United States Court of Appeals for the Fourth Circuit has not had occasion to rule on the proper test of where a claim arises for purposes of § 1391(a) or (b). Generally, however, the principal standards used by the federal courts are:

(1) the place of injury rule;

(2) the weight of the contacts rule; and

(3) the rule which turns on whether a substantial part of the events or omissions giving rise to the claim occurred in the district.

*Cochrane v. Iowa Beef Processors, Inc.*, 596 F.2d 254 (8th Cir. 1979), *cert. denied*, 442 U.S. 921, 99 S.Ct. 2848, 61 L.Ed.2d 290 (1979). *See* 15 Wright, Miller and Cooper, *Federal Practice and Procedure*, § 3806 (1976 and 1980 Supp.).

The place of injury test deems that the claim arises in the district in which the plaintiff's injuries were suffered, *i.e.*, where the effect of the defendants' allegedly wrongful act occurred. *See, e.g. Sherman v. Moore*, 86 F.R.D. 471 (S.D.N.Y.1980) (claim for personal injuries received in automobile accident held to arise in district in which accident occurred); *Sheffield v. Texas*, 411 F.Supp. 709 (N.D.Tex.1976) (challenge to the constitutionality of state school grant program held to arise in district where effect of the program was felt by the plaintiffs); *Maney v. Ratcliff, supra* (§ 1983 action based on an allegedly unlawful arrest and detention; claim arose where the arrest and detention occurred); *Alabama Great Southern Railroad Co. v. Allied Chemical Co.*, 312 F.Supp. 3 (E.D.Va.1970) (claim for damages sustained in train derailment arose where accident occurred).

The weight of the contacts test surfaced in *Philadelphia Housing Authority v. American Radiator & Standard Sanitary Corp.*, 291 F.Supp. 252 (E.D.Pa.1968), an antitrust action. There, the plaintiffs contended that their claims arose under § 1391(b) in any district in which the defendant had sold products at a price elevated by the conspiracy involved. In rejecting this argument, the court held that the determination of where a claim arises depends on "where the

contacts weigh most heavily." 291 F.Supp. at 260. Venue, said the court, is proper in a district in which occurred an act that constituted a significant and substantial element of the wrongdoing, but not proper in a district where only insignificant or meaningless conduct had taken place. It concluded that venue was appropriate in the district where the alleged conspiracy had occurred.

This weight of the contacts approach requires a comparison of the defendants' contacts in the various districts involved in the case and a finding that the claim arose in the district where the contacts have been "most significant." *Honda Associates, Inc. v. Nozawa Trading, Inc.*, 374 F.Supp. 886, 891 (S.D.N.Y.1974). *Honda* was a trademark infringement action brought in the Southern District of New York by a New York corporation against a California corporation. The defendant in that case had sent 20 catalogues to potential customers in New York and sold only $37 of orders for the allegedly infringing goods in New York state. The court decided that the infringement claim arose for purposes of § 1391(b) in California, since the weight of the contacts was there.

The contacts test has been used in antitrust cases, *e.g. Redmond v. Atlantic Coast Football League*, 359 F.Supp. 666 (S.D.Ind. 1973); *Fox-Keller, Inc. v. Toyota Motor Sales, U.S.A., Inc.*, 338 F.Supp. 812 (E.D.Pa. 1972); *California Clippers, Inc. v. United States Soccer Football Association*, 314 F.Supp. 1057 (N.D.Cal.1970), and in other types of cases. In *United States Fidelity & Guaranty Co. v. Alexander, supra*, a Miller Act[5] claim, a surety brought an action against its indemnitor, the contractor-principal on a performance bond. The court held that the claims arose under § 1391(a) in the district in which the construction sites were located, the bond received and awarded, and the defaults by the contractor occurred. *British-American Insurance Co., Ltd. v. Lee*, 403 F.Supp. 31 (D.Del.1975), was a corporate mismanagement case by a

---

**5.** 40 U.S.C. §§ 270a *et seq.*

Bahamas corporation against its dominant officer and director, a resident of Florida. The plaintiff charged that the defendant had used a Delaware trust to dominate the affairs of the company. The court found that the allegedly wrongful acts were perpetrated on the corporation at its domicile and principal place of business in the Bahamas and that the transmittal of voting instructions through the Delaware trustee was only an insignificant part of the facts which gave rise to the plaintiffs rights to be enforced in the suit. The contacts test has also been used in a civil rights conspiracy case, *Kipperman v. McCone*, 422 F.Supp. 860 (N.D.Cal.1976).

Some courts have also noted that the place of injury rule and the weight of the contacts test merge to the extent that the injury itself is one of the contacts of the parties to be considered under the latter. *Glendale Federal Savings and Loan Ass'n v. Fox*, 481 F.Supp. 616 (C.D.Cal.1979) (action by federally charted savings and loan association against California state officials seeking declaration that the validity of "due-on-sale" clauses in its loan agreements was governed by federal law; the claim was held to arise in the district where plaintiff's home office was located, since its decisions on loans were made there); *Quinn v. Bowmar Publishing Co.*, 445 F.Supp. 780 (D.Md.1978) (action under the Age Discrimination in Employment Act;[6] claim arose where the plaintiff lived and worked, *i.e.*, where the loss of his employment occurred).

The third test noted above was originally proposed by the American Law Institute in its Study of the Division of Jurisdiction between State and Federal Courts, Official Draft 1969, §§ 1303(a)(1), 1314(a)(1), 1326(a)(1). It concludes that a claim arises in a district in which "a substantial part of the events or omissions giving rise to the claim occurred. . . ." *See* 15 Wright, Miller and Cooper, *Federal Practice and Procedure*, § 3806 (1976). This rule, which is open to the possibility that a claim may have arisen in more than one district, was followed in *Gardner Engineering Corp. v.*

*Page Engineering Co.*, 484 F.2d 27 (8th Cir. 1973), a suit by a prime contractor against a subcontractor for anticipatory repudiation of a contract. The court found that the claim arose under § 1391(a) in the district in which performance was to have occurred. Also, in *Lamont v. Haig*, 590 F.2d 1124 (D.C. Cir. 1978), an action by residents and visitors of a South Dakota Indian reservation to recover for damages allegedly caused by the use of army and air force personnel on the reservation for law enforcement purposes, the court concluded that venue was proper in the District of Columbia if the defendants' liability could be established in substantial part by proof of acts or omissions by the defendants which occurred there.

There is substantial confusion among the decided cases, and dispute among the instant parties, as to which of these tests should be used to determine where the claims in the present cases arose. Guidance for this Court must come from the opinion of the Supreme Court in *Leroy v. Great Western United Corp., supra.*

The plaintiff in *Leroy*, a Delaware corporation headquartered in Dallas, Texas, had made a tender offer for the shares of a target company whose principal business, assets and offices were located in Idaho. The target also did business in New York and Maryland. The plaintiff filed an action in the Northern District of Texas against the state officials responsible for enforcing the state takeover statutes of Idaho, New York and Maryland, seeking a declaration that the statutes were invalid. The claims against the Maryland and New York officials were dismissed since they did not intend to enforce their statutes against the plaintiff. The Court ultimately determined that the claim against the Idaho officials arose in Idaho and venue was not proper in the Texas district under § 1391(b).

The Court's approach in reaching this decision indicates that the proper test of where a claim arises involves some analysis of the contacts between the claim and the

---

**6.** 29 U.S.C. §§ 621 *et seq.*

various districts concerned. 443 U.S. at 186, 99 S.Ct. at 2718. The Court rejected the Fifth Circuit Court of Appeals' reasoning that the claim arose in Dallas because the plaintiff proposed to initiate its tender offer there and the impact, prevention of the tender offer, of the Idaho officials' decision to enforce their statute was felt there. Rather, said the Court, the claim against the Idaho officials had its only locus in the District of Idaho, because the plaintiff's claim rested on action taken or to be taken in Idaho by Idaho residents: enactment of the statute, review of the plaintiff's tender offer, entry of an order postponing the effective date of the offer and any future punishment proceedings. This meant that the majority of the relevant evidence and witnesses was located in Idaho. Also, federal judges sitting in Idaho were better able to construe the Idaho law than Federal judges elsewhere. Another ground given for rejecting the place of impact test was that it could subject the Idaho officials to suit in almost every district in the country, since every prospective offeree-shareholder of the target company would argue that he or she was prevented from accepting the offer by the officials' actions. This ruling came in the context of § 1391(b), which provides that a suit not founded solely on diversity jurisdiction may be brought only in the district where all defendants reside, or where the claim arose. Section 1391(a), by allowing suit wherever all the plaintiffs of an action reside, by its terms exposes the defendant in a diversity case to suit in numerous districts. However, if the "claim arose" language of § 1391(a) is to be given any meaning, and its venue gap filling purpose is to be achieved, it must be construed in a manner similar to the construction given the same language in § 1391(b) by the *Leroy* Court. Thus, at least in cases involving activity by diverse defendants which may have caused injury in a multitude of districts, the place of injury is not the sole test of where the claim arises.

The instant cases involve such alleged activity, and this Court must analyze the contacts between plaintiffs' claims and this district to determine whether they arose herein, in Connecticut or Maryland as Lerner and Davis argue, in New York as Pee Wee asserts, or in England, as Robins contends. Since the plaintiffs allege that all defendants contributed to their injuries and joined in a conspiracy to do so, venue will be proper for all defendants if it can be said that their claims arose here. Although England had an important contact with these claims since the injuries occurred there, this Court concludes that under the *Leroy* approach, which places greater emphasis on the conduct of the defendants, the plaintiffs' claims rest on conduct and transactions which occurred chiefly within this district and this district is the one with the most significant contact with the operative facts giving rise to plaintiffs' claims.

The conduct of the principal defendant, Robins, occurred within this district. The Shield was assembled primarily in Richmond, and decisions and planning for the distribution, marketing and testing of the device occurred within and were controlled from this district. Whatever conduct by Robins which might result in a finding of negligence in design, manufacture or distribution or breach of warranties on the product occurred within this district, and the acts or omissions of the other defendants contributing to this alleged fault occurred here or were coordinated from this district. Decisions and preparation by the defendants which may have caused their advertising for the Shield to be fraudulent took place here or were directed from this district and acceptance of the Shield in England was made dependent on information generated here. Facts relevant to the defendants' knowledge of defects in the Shield and any efforts to suppress such information will be found here. Lerner and Davis themselves had contacts with this district, as their consulting services, provided Robins, occurred through correspondence within this district and at least some meetings and conferences in Richmond. Their advice was considered and acted upon by Robins in this district. Pee Wee also had its own contacts with this district in that it shipped the plastic parts for the Shield to

Robins in Richmond. Negotiations surrounding its relationship with Robins occurred here. The bulk of the relevant evidence on the design, manufacture, testing, distribution, promotion and marketing of the Shield and any wrongdoings involved in these steps will be located in this district. Of course, Robins' activities within this district are most obvious, while the ties of Lerner, Davis and Pee Wee to this area are less prominent. On the other hand, the significant part of the operative facts concerning the defendants' joint liability lie within this district. If the Congressional purpose of closing venue gaps is to be achieved under § 1391(a) in a case where the only possible ground for venue is the locus of claims against multiple diverse defendants, venue must be found proper in a district in which the greater part of the defendants' acts or omissions occurred, even though some of the defendants have conducted activities in other districts. This Court concludes that the contacts of plaintiffs' claims with this forum outweigh those with the English or any other setting.

The Court's conclusion in this regard is buttressed by the results in several cases involving somewhat analogous claims. *Manatee Cablevision Corp. v. Pierson*, 433 F.Supp. 571 (D.D.C.1977), was a malpractice action by a Florida corporation against its former attorneys, who were located in Washington, D. C. The court held that the plaintiff's claim arose under § 1391(a) in the D.C. district, regardless of the fact that plaintiff was a Florida resident and that the litigation which gave rise to its claim was before a federal court in Florida. Determinative for the Court were its findings that most of the meetings between the plaintiff and the defendants occurred in D.C., and that the majority of the work done by the defendants on behalf of the plaintiff was performed in their office there.

The plaintiff in *Ghazoul v. International Management Services, Inc.*, 398 F.Supp. 307 (S.D.N.Y.1975), was an alien who claimed that his debtor, a New York corporation, and a Washington, D.C. corporation had engaged in a fraudulent transaction with the intent of defrauding him. The court, using the weight of the contacts test, found that the material events surrounding the transaction, the alleged fraudulent conduct, took place in New York and that the claim against both of the defendants arose within the meaning of § 1391(a) in New York. This was so even though the D.C. corporation had only participated in the transaction from its office in Washington, a fact which the court saw as not significant "in the context of the overall scheme of events. . . ." 398 F.Supp. at 315.

Lastly, *ITT Thorp Corp. v. Firemen's Insurance Co.*, 428 F.Supp. 62 (E.D.Wis.1977), was a diversity action on a stockbroker's blanket bond issued by the defendant to the plaintiff. The plaintiff sought recovery for losses allegedly caused by dishonest or fraudulent loan practices on the part of its employee. The court concluded that the claims arose in the district in which the employee's allegedly fraudulent activities occurred.

## III. FORUM NON·CONVENIENS

■■ Though venue be proper in this district, the Court may refuse to exercise its jurisdiction under the doctrine of *forum non conveniens* if this forum is an inconvenient one for these actions. Generally, if a more convenient federal forum is available, a court may transfer the action to that district under 28 U.S.C. § 1406(a). Where the alternative forum is a state court or a court of a foreign country, however, the court chosen by the plaintiff may dismiss the action. *Schertenleib v. Traum*, 589 F.2d 1156 (2d Cir. 1978); *Poe v. Marquette Cement Mfg. Co.*, 376 F.Supp. 1054 (D.Md. 1974); *Levin v. Mississippi River Corp.*, 289 F.Supp. 353 (S.D.N.Y.1968).

The instant plaintiffs contend that this district is an appropriate forum for these actions. Robins, on the other hand, argues that the doctrine of *forum non conveniens* dictates that the more convenient forum lies in England. Although Lerner and Davis mention that alternative forums are available in Connecticut and Maryland, re-

spectively, their arguments are all directed at showing the propriety of an English setting.

■ The Supreme Court has not ruled on whether federal or state law governs the *forum non conveniens* inquiry in a federal court. *See Gulf Oil Corp. v. Gilbert,* 330 U.S. 501, 509, 67 S.Ct. 839, 843, 91 L.Ed. 1055 (1947). This court concludes that the question is one of federal law. *See Grodinsky v. Fairchild Industries, Inc.,* 507 F.Supp. 1245, 1249 n.2 (D.Md.1981); *Fiorenza v. United States Steel International, Ltd.,* 311 F.Supp. 117 (S.D.N.Y.1969); *Lapides v. Doner,* 248 F.Supp. 883 (E.D.Mich.1965); 15 Wright, Miller and Cooper, *Federal Practice and Procedure,* § 3828 (1976 and 1980 Supp.).

■ The defendants have the burden of proving that these cases should be dismissed on *forum non conveniens* grounds. *Schertenleib v. Traum, supra.* This burden is a heavy one, for "unless the balance is strongly in favor of the defendant, the plaintiff's choice of forum should rarely be disturbed." *Gulf Oil Corp. v. Gilbert, supra,* 330 U.S. at 508, 67 S.Ct. at 843.[7] The doctrine leaves the district judge much discretion. *Gulf Oil* at 508, 67 S.Ct. at 843.

A. Availability of an Alternative Forum:

■ The *forum non conveniens* doctrine comes into play only if the defendants are able to show that an alternative forum is available to the plaintiffs, for the doctrine "presupposes at least two forums in which the defendant is amenable to process . . ." and "furnishes the criteria for choice be-

tween them." *Gulf Oil, supra* at 507, 67 S.Ct. at 842. If there exists a forum in addition to this district which has jurisdiction and venue over these cases, the defendants must then demonstrate that the trial of the action would more appropriately take place in that forum. *Dahl v. United Technologies Corp.,* 632 F.2d 1027 (3rd Cir. 1980).

The defendants contend that the courts of England provide an alternative forum for these actions. Plaintiffs argue that those courts would not have jurisdiction over the defendants, that they may be barred from bringing new actions by statute of limitations problems there, that the remedy available in England is inadequate and uncertain, that pre-trial procedures are superior in this forum, and that they lack sufficient financial resources to bring actions in England because of the absence of the contingent fee system there.

Defendants maintain that they are subject to the jurisdiction of an English court under British law, or, absent that fact, they are willing to consent to such jurisdiction. Plaintiffs deny that defendants are amenable to suit in England, and argue that an alternative forum exists there for purposes of the *forum non conveniens* doctrine only if they could have brought an action against the defendants there *ab initio,* regardless of any consent by defendants to submit themselves to British jurisdiction. Plaintiffs base this position on *Hoffman v. Blaski,* 363 U.S. 335, 80 S.Ct. 1084, 4 L.Ed.2d 1254 (1960), and *Tivoli Realty v. Interstate Circuit, Inc.,* 167 F.2d 155 (5th Cir. 1948) *cert. denied,* 334 U.S. 837, 68 S.Ct. 1494, 92 L.Ed. 1762 (1948).

---

**7.** Robins contends that since several of the instant cases were originally filed in the Northern District of California, the forum choice of these plaintiffs deserves less weight than in the normal case. This district, however, is the current choice of the plaintiffs, and they should not be penalized by the transfer. Section 1406(a) is designed to avoid injustice to plaintiffs because of erroneous guesses as to venue. *Goldlawr, Inc. v. Heiman,* 369 U.S. 463, 82 S.Ct. 913, 8 L.Ed.2d 39 (1962). There is no indication in the present record that these plaintiffs filed their suits in the California district out of bad faith or in an attempt to harass or inconvenience the defendants. The legislative purposes of avoid-

ing injustice and adjudication of cases on the merits would be ill served if the fact of a prior § 1406(a) transfer could be used to defeat jurisdiction in the transferee district as well.

This Court also rejects the defendants' argument that a foreign plaintiff's choice of forum is entitled to less weight than that of an American plaintiff, as have the courts in *Reyno v. Piper Aircraft Co.,* 630 F.2d 149 (3rd Cir. 1980), *cert. granted,* 450 U.S. 909, 101 S.Ct. 1346, 67 L.Ed.2d 333 (1981), and *Alcoa Steamship Co., Inc. v. M/V Nordic Regent,* 654 F.2d 147 (3rd Cir. 1980).

■ This Court agrees with the reasoning of the Court of Appeals for the Second Circuit in *Schertenleib v. Traum, supra,* that the *forum non conveniens* doctrine does not require that the alternative forum exist when the plaintiffs first file their suits. The *Hoffman* Court was construing the specific language of 28 U.S.C. § 1404(a), which allows the transfer of a civil action to a district "where it might have been brought," and concluded that a district in which the plaintiff could sue the defendant only if he consents is not one where the action "might have been brought." 363 U.S. at 344, 80 S.Ct. at 1090. *Hoffman* does not control here, and its reasoning does not apply, since § 1404(a) is not involved. This Court could, however, condition any dismissal upon the defendants' consent to jurisdiction and service of process in Britain and the willingness of a British court to hear these actions. *See Dahl v. United Technologies, supra; Schertenleib v. Traum, supra; Mohr v. Allen,* 407 F.Supp. 483 (S.D.N.Y.1976). The other factors to be considered in the *forum non conveniens* inquiry will safeguard against any "reverse forum shopping" by the defendants in an attempt to waive themselves into a forum oppressive to the plaintiffs. *Pain v. United Technologies Corp.,* 637 F.2d 775, 784 (D.C. Cir.1980). A conditional dismissal would allow this Court to hear these cases if a jurisdictional defect were raised by an English court *sua sponte,* a possibility mentioned by the Court in *Gkiafis v. Steamship Yiosonas,* 387 F.2d 460 (4th Cir. 1967).

The possibility of a statute of limitations bar to reinstituting these suits in England is one factor favoring exercise by this Court of its jurisdiction over these cases. *The Fletero v. Arias,* 206 F.2d 267 (4th Cir. 1953), *cert. denied,* 346 U.S. 897, 74 S.Ct. 220, 98 L.Ed. 398 (1953). However, the *Gulf Oil* requirement of an alternative forum does not necessarily require one where the plaintiffs "will succeed on the merits." *Mizokami Bros. of Arizona v. Mobay Chemical Corp.,* 483 F.Supp. 201 (W.D.Mo.1980). Moreover, Robins has offered to waive in England any statute of limitations defense not available when these actions were origi-

nally filed in this country. This Court could condition any dismissal upon such an agreement by all the defendants. *See, e.g. Fitzgerald v. Texaco Inc.,* 521 F.2d 448 (2d Cir. 1975), *cert. denied,* 423 U.S. 1052, 96 S.Ct. 781, 46 L.Ed.2d 641 (1976).

Of course, the possibility that the plaintiffs might have to return to this forum if any of the conditions on the dismissal were not satisfied is one factor to be weighed in deciding whether to dismiss these cases. *Schertenleib v. Traum, supra* at 1163.

Defendants argue that the lack of a contingent fee system in the United Kingdom does not preclude dismissal, and that the financial constraints on the plaintiffs' ability to bring suits there are relieved by the availability of legal aid in Britain. Plaintiffs have submitted affidavits attesting to their lack of sufficient funds to pursue these actions in England and their inability or perceived inability to obtain legal aid. The absence of a contingent fee system in England is a factor which favors this Court's retention of jurisdiction, though it is not determinative. *Fiorenza v. United States Steel International, Ltd., supra,* at 120 (impecunious plaintiff unable to work; no contingent fee system in the Bahamas, the allegedly alternative forum, mentioned as one ground for the court's refusal to dismiss the action); *Constructora Ordaz, N.V. v. Orinoco Mining Co.,* 262 F.Supp. 90 (D.Del.1966). The financial difficulties facing a plaintiff in England were raised as a factor in *Abouchalache v. Hilton International Co.,* 464 F.Supp. 94 (S.D.N.Y.1978), *aff'd without opinion sub nom. Collins v. Hilton International Co.,* 628 F.2d 1344 (2d Cir. 1980), but the court, in dismissing the actions involved, chose to ignore the consideration because it doubted the impossibility of the plaintiffs to afford the litigation in England. In the present cases, defendants have failed to show that the plaintiffs will be able to bring their claims in England. This factor, though not determinative, merits some weight in this Court's determination of whether dismissal of these actions will serve the ends of justice. In other respects, the Court assumes that England

does offer an alternative forum for these actions.[8]

## B. The *Gulf Oil* inquiry:

The *Gulf Oil* Court listed two groups of factors to consider in a *forum non conveniens* inquiry. It first stated several private interest factors:

> An interest to be considered, and the one likely to be most pressed, is the private interest of the litigant. Important considerations are relative ease of access to sources of proof; availability of compulsory process for attendance of unwilling, and the cost of obtaining attendance of willing, witnesses; possibility of view of premises, if view would be appropriate to the action; and all other practical problems that make trial of a case easy, expeditious and inexpensive. There may also be questions as to the enforcibility of a judgment if one is obtained. The court will weigh relative advantages and obstacles to fair trial. It is often said that the plaintiff may not, by choice of an inconvenient forum, "vex," "harass," or "oppress" the defendant by inflicting upon him expense or trouble not necessary to his own right to pursue his remedy. But unless the balance is strongly in favor of the defendant, the plaintiff's choice of forum should rarely be disturbed.

330 U.S. at 508, 67 S.Ct. at 843. The Court also described the public interest factors to be reviewed:

> Administrative difficulties follow for courts when litigation is piled up in congested centers instead of being handled at its origin. Jury duty is a burden that ought not to be imposed upon the people of a community which has no relation to the litigation. In cases which touch the affairs of many persons, there is reason for holding the trial in their view and reach rather than in remote parts of the country where they can learn of it by report only. There is a local interest in having localized controversies decided at home. There is an appropriateness, too, in having the trial of a diversity case in a forum that is at home with the state law that must govern the case, rather than having a court in some other forum untangle problems in conflict of laws, and in law foreign to itself.

*Id.* at 508–09, 67 S.Ct. at 843.

The application of these factors varies from case to case, and the outcome is "heavily dependent on the unique facts of particular cases." 15 Wright, Miller and Cooper, *Federal Practice and Procedure*, § 3828 (1976). In its discretion this Court must weigh these factors, no one of which is determinative, to ascertain whether the balance is "strongly in favor of the defendant." *Gulf Oil, supra,* at 508, 67 S.Ct. at 843.

The *Gulf Oil* decision illustrates the nature of this inquiry. There, the plaintiff, a resident of Lynchburg, Virginia, brought an action in the Southern District of New York to recover damages to his Lynchburg warehouse resulting from a fire allegedly caused by defendant's negligence in delivering gasoline there. The defendant was a Pennsylvania corporation, qualified to do business in Virginia and New York. Deciding that the Virginia courts provided a more appropriate setting for the action, the Court approved the New York district court's dismissal of the case. The grounds for this conclusion were that the plaintiff was not a New York resident and no events connected with the case occurred there. All persons who participated in the allegedly negligent acts resided in or near Lynchburg. The defendant claimed that a Lynchburg con-

---

**8.** The Court gives little weight to the plaintiffs' assertions that the remedy available in England is uncertain and that pre-trial procedures are superior in this forum. The defendants have consented to pay any judgment rendered against them by an English court. As discussed later in the opinion, Virginia choice of law rules will dictate that the substantive law of Great Britain be applied to these cases to determine the remedy if heard in this Court. The parties have not demonstrated to the Court the differences between this Court's and the British system of pre-trial procedures. For the purpose of this decision, it suffices that the Court does not feel that the pre-trial procedures available in England fail to comport with our concepts of fairness so as to give much authority to this factor.

tractor would be impleaded. Of the many witnesses to be called at the trial, only the experts resided in areas other than Lynchburg. The litigants could not compel their attendance in New York and depositions would not be satisfactory. Even this brief look at *Gulf Oil* reveals that the factors which tipped the balance of conveniences in favor of the defendant there are more in equipoise here, where events connected with these cases occurred both in this country and in England and evidence and witnesses are located in both places. This Court concludes, on the basis of the discussion *infra*, that the defendants have failed to make the showing necessary to disturb these plaintiffs' choice of forum.

1. Private interest factors:

a. Relative ease of access to sources of proof:

· Plaintiffs contend that documents relevant to their claims of negligent or improper design, manufacture and testing of the Shield are located in or near this district, and not in England. It appears that these records of the defendants are accessible here, and that materials concerning the promotional campaign to be given the Shield in the English market and the planning of this advertising are located here. Any evidence of defendants' knowledge of defects in the device and any conspiracy to suppress such information lies in or near this district.

Robins argues that plaintiffs' medical records and other evidence on the issues of causation and the extent of the plaintiffs' damages are located in England, beyond the subpoena power of this Court. It claims that the expense of obtaining documents and discovery in England for trial in this district will be unnecessarily great, that plaintiffs have or have access to documents

in this country, and it agrees to make any other documents available for a trial in the United Kingdom. Plaintiffs in turn assert that their medical records have already been provided the defendants and that they will continue to provide other records to Robins here. Robins' willingness to finance the transfer of documents in this country to England discounts the strength of its argument that obtaining evidence in England for trial here will be too expensive. Whether these cases are heard here or in England, there will be relevant evidence located in the other forum which cannot be subpoenaed without the cooperation of the foreign district and must be transported. Defendants have failed to show that the probative evidence on causation and extent of damages located in England exceeds the evidence on liability which is more accessible in this forum.

Furthermore, some of the necessary evidence located in the United Kingdom can be obtained through the channels of international judicial assistance available under the Hague Convention on the Taking of Evidence Abroad,[9] to which the United States and the United Kingdom are signatories.[10] The Convention provides for the use of a letter of request or letter rogatory to obtain evidence where the compulsory powers of a foreign court are needed.[11] Of course, this system is less than perfect and will not completely replicate the access to evidence which would exist if all relevant material were located in this country,[12] but does provide the parties to a trial here reasonable procedures by which to obtain evidence present in a foreign forum. Deficiencies would likewise exist if the situation were reversed, and the trials held in England. Since the Court concludes that the defendants have not shown that the evidence on causation and damages located in England

9. Convention on the Taking of Evidence Abroad in Civil or Commercial Matters, *done* March 18, 1970, 23 U.S.T. 2555, T.I.A.S. No. 7444. *See Pain v. United Technologies Corp.,* 637 F.2d 775, 788–790 (D.C.Cir.1980); Note, *Taking Evidence Outside of the United States,* 55 B.U.L.Rev. 368 (1975). The text of the convention is set out at 28 U.S.C.A. § 1781 (1980 Supp.).

10. *See Pain v. United Technologies Corp.,* 637 F.2d 775, 788 n.66.

11. Articles 1–14.

12. These deficiencies were discussed by the *Pain* court at 637 F.2d at 788–790.

exceeds the liability evidence present here, it seems that this litigation can be more easily managed in this forum.

A look at other products liability cases is informative. *Pain v. United Technologies Corp., supra,* involved wrongful death actions brought in the D.C. district court by foreign plaintiffs and one American plaintiff against the designer and manufacturer of a helicopter which crashed in the North Sea. The defendant was a Delaware corporation with its principal place of business in Connecticut, where the helicopter had been manufactured. Plaintiffs alleged liability on the basis of breach of warranty, strict liability and negligence. The defendant agreed to concede liability and contest only the damages issue in any suit brought outside the United States. The court affirmed the district court's dismissal of the actions, noting that the majority of the evidence on the plaintiffs theories of liability was located in the United States, but material relative to the defenses and extent of damages was located abroad. Since the defendants' liability would not be at issue in a trial in a foreign court, this factor favored dismissal. In the instant cases, liability will be at issue wherever the actions are tried. *Dahl v. United Technologies Corp., supra,* also concerned wrongful death actions against the Delaware designer and manufacturer of a helicopter which crashed in the North Atlantic. The Norwegian plaintiffs brought their actions in the district court in Delaware, arguing that the helicopter, manufactured in Connecticut, was defective in its design and manufacture. The court of appeals affirmed the *forum non conveniens* dismissal of the actions. While all records on design, manufacture and testing were in the United States, evidence on the negligent operation of the craft lay in Norway. Other evidence on the maintenance of the helicopter during the seven years since it had left the defendant's hands was in Nor-

way. In the instant case, however, the evidence on plaintiffs' liability theories will be located in the United States, and the evidence of intervening causes is less substantial than in *Dahl.*

Lastly, in *Harrison v. Wyeth Laboratories,* 510 F.Supp. 1 (E.D.Pa.1980), United Kingdom residents sought recovery from a Pennsylvania corporation for injuries or death caused by oral contraceptives purchased and used in the United Kingdom. They claimed that the defendant was negligent in its marketing and sale of the drugs in the United Kingdom, and in its failure to give adequate warnings of known risks in their use, claims similar to several raised by the instant plaintiffs. Although recognizing that evidence on the marketing decisions was located in Pennsylvania as well as in England, the court in *Harrison* concluded that the actions should be dismissed because, among other reasons, the manufacture and marketing of the drugs as well as the injuries had all occurred in the United Kingdom. In the present cases, the offending products were manufactured in the United States.[13]

If the defendants had conceded liability and damages were the only issue at trial, the factor of relative ease of access to sources of proof would favor dismissal to a foreign forum. Such was the situation in *Pain.* It is not however the case here, and thus the balance of inconveniences on this factor weighs more heavily in favor of trial in this forum.

b. Witnesses:

Robins asserts that English physicians who treated the plaintiffs or participated in testing the Shield in England will have to be transported to this district for a trial here, and that this Court lacks the power to compel the attendance of unwilling foreign

---

**13.** *In Re British Oral Contraceptive Cases,* No. L–44473–78 (N.J.Super.Ct.Law Div. July 20, 1981), may be distinguished on largely the same ground. Those cases involved eighty-one suits by United Kingdom citizens for personal injuries allegedly caused by oral contraceptives manufactured by the defendants. The plaintiffs' major claim was that the defendants failed to give adequate warning of the risks associated with use of the drugs. The court dismissed the actions on *forum non conveniens* grounds, emphasizing that all manufacturing, packaging and distribution of the pills occurred in the United Kingdom.

residents or witnesses. Plaintiffs counter that the testimony of these witnesses may be taken by deposition, or that they will provide the transportation expenses of treating physicians to testify here. By affidavit, plaintiffs assert that 90% of their trial evidence and witnesses are found in the United States.[14] Robins responds that many of these witnesses are not residents of Virginia, and offers to pay the incremental difference in airfare for those witnesses who would travel to this forum who appear and testify in England in a trial there. Robins also offers to produce all relevant company employees before a foreign court if ordered by the court or if their evidence is not admissible in alternative form.

Regardless of where the trials are held, travel by witnesses or the use of depositions of some will be inevitable. As with the documentary evidence, defendants have failed to show that the majority of the witnesses with probative testimony are located in England. Thus, a trial here will involve the lesser degree of inconvenience to the witnesses, expense in travel, and need for deposition testimony. The lack of subpoena power will also be a problem wherever the trials are held and will impose a lesser handicap if heard here.

As with the issue of access to evidence, certain international cooperative procedures will be available to the parties to a suit in this district in order to obtain testimony from witnesses in the United Kingdom. F.R.Civ.P. Rule 29 provides for the taking of deposition evidence abroad in a manner stipulated in writing by the parties. Rule 28(b) allows depositions in a foreign country on notice before a person authorized to administer oaths at the place of examination, either under a local law or American law, before a person commissioned by the court, or pursuant to a letter rogatory. These methods are sanctioned by the signatories to the Hague Evidence Convention.[15] The letter rogatory technique allows use of the foreign court's compulsory powers for unwilling witnesses.

c. View of the premises:

It does not seem that this factor deserves much weight in these cases. The present appearance of the defendants' facilities may or may not be relevant to production which occurred in 1971–1974.

d. The defendants' ability to implead other parties:

Robins claims that there are foreign parties, such as the plaintiffs' treating physicians, whose presence as parties in these suits is essential to a determination of the defendants' liability, but who could not be implied in an action in this district. Plaintiffs assert that there will be no need for such impleader, that the defendants have failed to specify adequately these possible parties, and that Robins could bring its own action against them in England for indemnity if it suffers an adverse judgment in this court. Defendants argue that their lack of specificity is a result of the plaintiffs' failure to provide them with complete medical records. The inability to implead third parties directly involved in the controversy is a factor which favors dismissal. *Pain v. United Technologies Corp., supra* at 790; *Fitzgerald v. Texaco, Inc., supra* at 453. In those cases, however, the crucial need to join identified third parties was clear. This Court lacks sufficient information on the possible third parties involved in these cases to give much weight to this factor. Moreover, in *Morehead v. Barksdale*, 263 F.2d 117 (4th Cir. 1959), the Court of Appeals for the Fourth Circuit approved of a refusal to dismiss an action against the operator of an automobile which crashed in Germany, even though the vehicle was insured by a German company.

2. Public Interest Factors:

a. Local interest in the matter:

Determining whether England or Virginia has the greater interest in this dispute is

**14.** Affidavit of Michael Friedman, submitted in opposition to defendants' motions to dismiss, at ¶ 5.

**15.** Note 9, *supra.*

one factor in the *forum non conveniens* inquiry, and turns on which forum should bear the burden of hearing the cases and which community should face the responsibility of jury duty they impose. Plaintiffs argue that Virginia has an interest in regulating the manufacture and promotion of products manufactured within its borders to ensure their safety and prevent the state from becoming a haven for the production of defective products. Defendants counter that the English legal system should be the one to assess the liability of a defendant for injuries which occurred in England under the standards of manufacture and distribution it desires for products marketed there.

In *Pain v. United Technologies Corp., supra,* the court concluded that the D.C. district had no interest in that products liability dispute, since it had no relation to the controversy. In contrast, this district is the home of the principal defendant in these cases, Robins, and the Shields were manufactured here. The Third Circuit in *Dahl, supra,* noted that Delaware's interest in the case was minimal since its only contact with the case lay in its being the defendant's state of incorporation. Virginia clearly has a greater contact to the instant cases. One factor behind the dismissal ordered in *Harrison, supra,* was the court's conclusion that Pennsylvania had no interest in regulating the safety of drugs produced and distributed in a foreign land, while the United Kingdom did have an interest in controlling drugs consumed in its own country. The fact that the Shields were manufactured in Virginia gives it a stronger interest in the present cases.

Lastly, *Grodinsky v. Fairchild Industries, supra,* involved actions in Maryland by Canadian plaintiffs against a Delaware corporation with its principal place of business in Maryland. Plaintiffs asserted claims arising out of a plane crash in Canada, suing on theories of negligence, breach of warranties, and strict liability. The plane had been manufactured and tested by the principal defendant in Maryland some twenty years before the crash. Although it acknowledged that Maryland had an interest in regulating the activities of corporations that place allegedly defective products into commerce, the court concluded that Canada's interest in the matter was the greater because its citizens were injured, two Canadian companies were defendants, the plane had been under the control of a Canadian company for twenty years before the crash, and Maryland's only contact with the case was that it was the site of manufacture many years before the accident. The Virginia contacts with the parties and issues involved in the present cases are much more direct and less remote in time.

It cannot be doubted that England has an interest in the safety of the products its citizens consume. It is clear, however, that Virginia has a strong interest in regulating the safety of products manufactured within its borders, and the conduct of its companies that may amount to the concealment of defects in products produced here. These local interests in these cases, and the contacts between Virginia and the dispute justify the burden on this Court and the citizens of this community in this Court's retention of jurisdiction over these cases.

b. What law applies:

 This Court must apply the conflicts of law rules of Virginia. *Klaxon Co. v. Stentor Electric Mfg. Co.,* 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941). Defendants assert that the Virginia rule in personal injury actions is that the law of the place of the injury, the *lex loci delecti,* will control. *Sutton v. Bland,* 166 Va. 132, 184 S.E. 231 (1936). Since plaintiffs' injuries were incurred in England, the laws of that country must be applied in the present cases. Although this is one factor which favors trial in England, it is not determinative, as a federal court can properly be called on to apply the law of a foreign country. *Olympic Corp. v. Societe Generale,* 462 F.2d 376 (2d Cir. 1972); *Grodinsky, supra; D'Angelo v. Petroleos Mexicanos,* 398 F.Supp. 72 (D.Del.1975); *Odita v. Elder Dempster Lines, Ltd.,* 286 F.Supp. 547 (S.D. N.Y.1968); *Karros v. S/S Lirye,* 247 F.Supp. 554 (E.D.Va.1965) (court willing to apply Liberian law).

**824**

C. Conclusion:

█ Trial of these cases will not be easy or expeditious regardless of where they are heard. Certain of the *Gulf Oil* factors, particularly the applicability of British law, do indeed favor dismissal in favor of a British setting. Nonetheless, the Court concludes that, not only does the balance fail to tip strongly in favor of the defendants, but the calculus of convenience favors trial in this forum. From a managerial, practical perspective, the relative advantages and obstacles to a fair trial and the public interests at stake warrant the retention of this Court's jurisdiction over these actions.

## IV. RULE 44.1

█ Robins also urges dismissal on the basis of F.R.Civ.P. Rule 44.1, which provides that a party who intends to raise an issue concerning foreign law must "give notice in his pleadings or other reasonable written notice." Robins argues that the law of Great Britain will apply to these actions under Virginia choice of law rules, and that the failure of the plaintiffs to give notice of the applicability of English law warrants dismissal. The Court disagrees.

The purpose of the notice requirement in Rule 44.1 is simply to avoid surprise. Certainly there is no risk of surprise present in the cases, for it is the defendants who have raised the question of the relevance of British law. The notice requirement "falls considerably short of a requirement that, in order to survive a Rule 12(b)(6) motion, a plaintiff must allege the identity and substance of the applicable law." *Grice v. A/S Ludwig Mowinckels*, 477 F.Supp. 365, 376 (S.D.Ala.1979). In cases such as the instant ones, where the applicability of foreign law is not obvious at the outset and is a matter of some contention among the parties, the "reasonable written notice," if required at all under Rule 44.1, may come at any time sufficient to give the court and the defendants adequate notice of the need to research the foreign rules.

An appropriate order has issued.